UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| PORT OF TACOMA, a public port district organized under the laws of the State of Washington,<br><br>　　　　　Plaintiff,<br>　v.<br><br>PQ LLC, a Pennsylvania Limited Liability Company,<br><br>　　　　　Defendant. | Case No. _____<br><br>COMPLAINT |

Plaintiff Port of Tacoma (the "Port") hereby alleges as follows:

## I.　INTRODUCTION

1.　The Port brings this civil action in diversity for cost recovery and a declaratory judgment under Washington's Model Toxics Control Act ("MTCA"), Wash. Rev. Code §70A.305 *et seq.*, and 28 U.S.C. §2201. The Port seeks to recover remedial action costs incurred when it responded to contamination resulting from the operations of the predecessors in interest of Defendant PQ LLC on two properties currently owned by the Port. The first property is identified by Pierce County Tax Assessor Number 2275200260 and is located at 1114 Taylor Way, Tacoma, Washington ("1114 Taylor Way"). The second property is identified by Pierce County Tax Assessor Number 0321263016 and is located at 1202 Taylor Way, Tacoma,

COMPLAINT -- 1

Case No.

NORTHWEST RESOURCE LAW PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564

Washington ("1202 Taylor Way," and collectively with 1114 Taylor Way, the "PQ Corporation Facility").

## II. JURISDICTION

2. Jurisdiction in this Court is proper under 28 U.S.C. §1332.

3. As a Washington port district with its principal place of business in Washington, the Port is a "citizen" of Washington for purposes of diversity jurisdiction.

4. As a limited liability company, PQ LLC's citizenship for the purposes of 28 U.S.C. §1332(a) is the citizenship of its members.

5. As explained further below in part IV, section B of this Complaint, on information and belief, the citizenship of PQ LLC's members, as of the date of this Complaint, are New York, Kansas, or some other jurisdiction other than Washington, making PQ LLC diverse to the Port.

6. Further, consistent with 28 U.S.C. §1332(a), the Port has incurred costs exceeding $75,000 for investigating and remediating the contamination at the PQ Corporation Facility and anticipates the future cleanup of the PQ Corporation Facility will likely cost millions of dollars.

## III. VENUE

7. Venue in this Court is proper under 28 U.S.C. §1391(b)(2) because the acts and omissions that give rise to the Port's claims occurred in Pierce County, Washington, and the property at issue in this matter is in Pierce County, Washington. For the same reasons, this case should be assigned to the Tacoma Division pursuant to Local Rules W.D. Wash. LCR 3(e)(1).

## IV. PARTIES

**A.  The Port Is a Washington Port District with a Mandate to Protect and Promote the Tacoma Harbor's Economy and Environment.**

8. Plaintiff the Port is a port district organized under the laws of the State of Washington, with its principal offices located at One Sitcum Plaza, Tacoma, Washington 98421.

COMPLAINT -- 2

Case No.

NORTHWEST RESOURCE LAW PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564

9. For more than one hundred years, the Port has worked to promote prosperity, trade, and jobs while protecting the environment in the Pacific Northwest. This commitment to the economy and the environment is central to the Port's history. As part of its work, the Port acquires and redevelops properties. However, as this case demonstrates, the Port's work also involves addressing the legacy of the lax environmental practices of past industrial operations on the Tacoma Tideflats.

10. On November 5, 1918, Pierce County voters, by a five-to-one margin, voted to establish the Port. Beginning with 240 acres and an innovative spirit, the Port expanded its operations in the years between its founding and World War II, taking advantage of laws passed in 1939 that allowed the Port to establish an Industrial Development District spanning the Tacoma Tideflats, which attracted many companies to the Tacoma area, fostering economic development for its citizens.

11. During World War II, the Port was the site of intensive shipbuilding efforts. A total of seventy-four warships were launched during the war and, at its peak, more than 30,000 people were employed in those shipbuilding efforts.

12. The end of World War II presented significant challenges for the Port because maritime trade dropped by ninety percent immediately after the war ended. The Port responded to this challenge by attracting new manufacturing companies to Port properties, which included concrete manufacturers, chemical manufacturers, and ship builders. The Port's economic revitalization efforts staved off economic shock in the area and further attracted other entities who purchased land and built industrial facilities. PQ LLC's predecessor, the Philadelphia Quartz Company of California, Ltd. was one of those entities.

13. In the 1950s and 1960s, the Port made several strategic infrastructure investments that set the stage for the future economic development and environmental restoration that the area would experience in the coming decades. For example, the Port extended and widened the

COMPLAINT -- 3

Case No.

NORTHWEST RESOURCE LAW PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564

Blair and Hylebos waterways and purchased surplus land from the federal government. By the end of the 1960s, the Port more than doubled in size.

14. The 1970s saw the Port expand its export activities, including log and agriculture exports, and expanding its facilities to handle wheeled cargo such as trucks, cars, and semi-trailers.

15. During the 1980s, the Port successfully responded to the introduction of containerized shipping, constructing facilities that involved large cranes and straddle carriers which efficiently moved containers of goods on and off ships. The Port's containerized traffic grew almost twentyfold from 1976 to 1990. During this time, the Port also worked to enhance the environment. For example, the Port worked with the Puyallup Tribe to construct the Gog-Le-Hi-Te Wetlands on the Puyallup River, transforming approximately fifteen acres of a former city landfill into crucial habitat for birds and other wildlife that depend on wetlands.

16. During the 1990s and into the 2000s, the Port continued to invest in economic prosperity and the environment. The Port deepened waterways to accommodate new generations of larger vessels and developed new container terminals. During this process, the Port restored hundreds of acres of habitat.

17. The Port's property acquisition strategy has long reflected its dual objectives of developing the regional maritime economy while protecting its environment. Thus, it is important to distinguish the Port from a private developer that chooses to redevelop a contaminated or "brownfield" property. Unlike a private developer, the Port is entirely dependent on property co-located with the harbor to further its mission.

18. This unique constraint necessarily means that many of the properties that are suitable for use by the Port are industrial in nature and were occupied by industrial manufacturers such as PQ LLC's predecessors after World War II, who left behind toxic legacies that the Port must address.

COMPLAINT -- 4

Case No.

NORTHWEST RESOURCE LAW PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564

19. These properties present a unique public policy challenge. The costs of remediating them often exceed the value of the land itself. Without the Port's efforts, these properties would never be cleaned up—resulting in ongoing environmental impacts to the Puget Sound and economic blight to the region. Without the Port, many of these legacy industrial properties on the Tacoma Tideflats would never meet the purpose of MTCA as stated in Wash. Rev. Code §70A.305.010(4), specifically the public interest to "clean up and reuse contaminated industrial properties in order to minimize industrial development pressures on undeveloped land and to make clean land available for future social use."

20. The PQ Corporation Facility falls into the category of acquired contaminated properties that likely would never have been remediated if not for the Port's intervention. When the Port acquired the PQ Corporation Facility in 2008, PQ LLC's predecessors had left it as so many other sites in the Tacoma Tideflats were left when the Port acquired them: used, contaminated, and discarded. After cleaning up significant contamination, the Port now seeks to recover the costs from the polluter that caused that contamination.

**B.    Defendant PQ LLC Is a Multinational Chemical Manufacturer with a Long History of Industrial Operations.**

21. Defendant PQ LLC is a Pennsylvania limited liability company with its principal place of business in Malvern, Pennsylvania.

22. Today, PQ LLC is a privately held multinational chemical company worth hundreds of millions of dollars. Its operations include chemical manufacturing and processing plants in Louisiana, Indiana, Georgia, Canada, Mexico, Finland, the Netherlands, Brazil, Thailand, and Australia.

23. PQ LLC's history traces back to 1904 to the incorporation of the Philadelphia Quartz Company in Pennsylvania for the purposes of "manufacturing chemicals."

24. In 1917, the Philadelphia Quartz Company incorporated an affiliate in California, the Philadelphia Quartz Company of California, Ltd.

COMPLAINT -- 5

Case No.

NORTHWEST RESOURCE LAW PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564

25. In 1941, through a series of transactions, the Philadelphia Quartz Company of California, Ltd. acquired the PQ Corporation Facility at issue in this litigation.

26. In 1970, the Philadelphia Quartz Company of California, Ltd. merged with the Philadelphia Quartz Company. The surviving corporation of that merger was the Philadelphia Quartz Company, a Pennsylvania corporation.

27. In 1978, the Philadelphia Quartz Company changed its name to "PQ Corporation."

28. By 2016, PQ Corporation was a wholly owned subsidiary of PQ Group Holdings Inc., a Delaware corporation and holding company to several international companies and business entities specializing in chemical manufacturing, processing, and servicing.

29. In 2017, PQ Group Holdings Inc. completed an initial public offering and began trading under the New York Stock Exchange under the stock ticker "PQG." After going public on the New York Stock Exchange, PQ Group Holdings Inc. achieved a valuation of over $600 million in 2017.

30. On or about February 28, 2021, PQ Group Holdings Inc. entered into a stock purchase agreement to sell one hundred percent of the equity interests in PQ Corporation, alongside other chemical business subsidiaries, to Sparta Aggregator L.P., a Cayman Islands exempted limited partnership formed and funded by Cerberus Capital Management, L.P. and Koch Minerals & Trading, LLC.

31. In connection with that sale, on July 30, 2021, PQ Corporation filed a statement of conversion with the Pennsylvania Department of State to convert the corporation to a Pennsylvania limited liability company named "PQ LLC," effective August 1, 2021.

32. On August 1, 2021, PQ Group Holdings Inc. completed its sale of one hundred percent of the equity interests in PQ LLC to Sparta Aggregator L.P.

COMPLAINT -- 6

Case No.

NORTHWEST RESOURCE LAW PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564

33. On information and belief, PQ LLC is the wholly owned subsidiary of Sparta Aggregator L.P., a Cayman Islands exempted limited partnership with its registered office in Grand Cayman, Cayman Islands.

34. On information and belief, Cerberus Capital Management, L.P. and Koch Minerals & Trading, LLC are the sole partners of Sparta Aggregator L.P.

35. Cerberus Capital Management, L.P. is a Delaware limited partnership.

36. The sole general partner of Cerberus Capital Management, L.P. is Craig Court GP, LLC, a Delaware limited liability company.

37. On information and belief, the sole member of Craig Court GP, LLC is Craig Court Inc., a New York corporation.

38. On information and belief, none of the limited partners of Cerberus Capital Management, L.P. are citizens of Washington.

39. Koch Minerals & Trading, LLC is a Delaware limited liability company.

40. On information and belief, Koch Industries, LLC is the sole member of Koch Minerals & Trading, LLC.

41. Koch Industries, LLC is a Kansas limited liability company. On information and belief, none of the members of Koch Industries, LLC are citizens of Washington.

V. FACTS

A. The History of PQ LLC's Operations at the PQ Corporation Facility.

42. In 1941, through a series of transactions, PQ LLC's predecessor acquired title to the properties comprising the PQ Corporation Facility.

COMPLAINT -- 7

Case No.

NORTHWEST RESOURCE LAW PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564

43. Soon after acquiring title, PQ LLC's predecessor constructed a sodium silicate manufacturing and processing facility at the PQ Corporation Facility. That facility consisted of eleven buildings, twenty above-ground storage tanks ("ASTs"), and other structures, and is depicted in the following aerial photograph of the PQ Corporation Facility from 1965:



44. From 1941 to 2008, PQ LLC's predecessors produced sodium silicate solids and solutions at this facility. As seen in the above aerial photograph, these chemical manufacturing operations were sprawling and careless, typical of the types of chemical manufacturing operations that existed on the Tacoma Tideflats prior to modern environmental laws.

45. Sodium silicate has multiple uses, including coagulation, corrosion control, and as an adhesive. Accordingly, sodium silicate is utilized in various industries, including automotive repair, water treatment, cement, ceramics, drilling, detergent and cleaning products, and other consumer products.

46. In broad terms, sodium silicate is produced by mixing silica sands and "soda ash" and heating that mixture to a molten state using a furnace. That molten mixture is then cooled and processed for packaging and transportation to markets throughout the United States.

47. Sodium silicate is caustic, with a pH exceeding twelve, and is corrosive. Sodium silicate exposure to skin can cause burns, and inhalation or eye contact may cause significant

COMPLAINT -- 8

Case No.

NORTHWEST RESOURCE LAW PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564

injury to humans. In the environment, releases of sodium silicate can alter the pH of soils and groundwater, resulting in a cascade of toxic effects, including mobilization of metals and arsenic.

48. PQ LLC's predecessors produced their sodium silicates primarily in a boiler house located in the middle of 1202 Taylor Way, near the property line dividing 1114 and 1202 Taylor Way. The boiler house was equipped with a furnace and machinery and is the narrow rectangular building to the left of the eight visible ASTs in the 1965 aerial photograph seen above.

49. To fuel the furnace in the boiler house, PQ LLC's predecessors initially supplied the furnace with Bunker C fuel oil that was stored in an AST in the southern portion of 1202 Taylor Way. PQ LLC's predecessors fed the fuel oil to the boiler house through connecting piping between the AST and boiler house.

50. Bunker C fuel oil is an extremely heavy residual oil left over from refining crude oil. It was commonly used in ship boilers but was also used as a cheap but dirty source of energy for industrial processes. Burning Bunker C results in soot and smoke that contains significant amounts of carcinogenic compounds and other hazardous substances.

51. PQ LLC's predecessors used petroleum products in other aspects of the operations at the PQ Corporation Facility. The Port's environmental investigations reveal that PQ LLC's predecessors released Bunker C fuel oil and other petroleum products at the PQ Corporation Facility during its operations.

52. PQ LLC's predecessors stored sodium silicate, process water, silica sand, soda ash, and fuel oil in various storage tanks throughout the PQ Corporation Facility. Most of these tanks lacked modern "secondary containment" to contain leaks or spills. The Port's investigations reveal that this improper storage of sodium silicate, process water, and soda ash resulted in releases to soils that altered the pH of soils and groundwater, further contributing to the contamination at the PQ Corporation Facility.

NORTHWEST RESOURCE LAW PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564

53. Additionally, while PQ LLC's predecessors stored some of their raw materials in a warehouse located north of the boiler house, other materials and fill were stored in large piles on the ground at 1202 Taylor Way. The Port's environmental investigations reveal that PQ LLC's predecessors' improper storage of these materials and fill resulted in releases of multiple hazardous substances.

54. Moreover, during their operational history at the PQ Corporation Facility, PQ LLC's predecessors discharged cooling water and "boiler blowdown"—materials and byproducts used and produced in the sodium silicate manufacturing process—into a pond to the west of the facility. The Port is now remediating these additional discharges, which were additional sources of hazardous substances.

55. PQ LLC's predecessors assuredly knew their operations resulted in releases of hazardous substances. For instance, on November 7, 1990, the Washington State Department of Ecology ("Ecology") notified PQ LLC's predecessor that its "high pH discharge[s]" (*i.e.*, of the cooling water and boiler blowdown referenced above) into the pond west of its facility were in violation of Wash. Rev. Code §90.48.080 (prohibition against polluting state waters), and that PQ LLC's predecessor was required to obtain a waste discharge permit for its discharges or make alternate arrangements for the discharges. And yet, despite such evidence, PQ LLC and its predecessors did nothing to remediate their releases of hazardous substances.

56. It is worth emphasizing the foregoing reality of PQ LLC's predecessors' operations. While hazardous substances associated with waste were released in many ways, the operations at the PQ Corporation Facility were so careless that it released significant amounts of its valuable product—sodium silicate—into the soil and groundwater. PQ LLC's predecessors spilled this valuable product in such significant quantities that it altered the chemistry of the soils—raising the pH of those soils to levels that are corrosive and caustic and remained so decades after their operations ceased. PQ LLC's predecessors' careless loss of valuable product

COMPLAINT -- 10

Case No.

NORTHWEST RESOURCE LAW PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564

underscores the magnitude of disregard for proper handling of waste materials at their operations.

57. Because PQ LLC and its predecessors did not remediate the contamination on 1202 Taylor Way, those contaminants migrated to the soils and groundwater throughout the PQ Corporation Facility.

**B.    The Port's Remedial Activities at the PQ Corporation Facility.**

58. On April 1, 2008, as part of the Port's longstanding mission to make strategic investments in the Tacoma Harbor, the Port acquired the PQ Corporation Facility.

59. In the context of acquiring the PQ Corporation Facility, the Port conducted a Phase I Environmental Investigation and a Phase II Environmental Investigation of the areas where PQ LLC's predecessors stored diesel and kerosene for its operations. Unfortunately, those investigations did not reveal the extent of the contamination caused by PQ LLC's predecessors' operations.

60. On or around May 12, 2009, just over a year after the acquisition, the Port discovered deposits of sodium silicate in a stormwater ditch located on or near the properties. This discovery occurred during the Port's efforts to eradicate the invasive Mediterranean Vinyard Mud Snail from the ditch adjacent to the PQ Corporation Facility in cooperation with the Washington State Department of Agriculture. To eradicate those snails, the Port needed to remove extremely overgrown vegetation in that ditch, which involved the oversight of the United States Environmental Protection Agency and the United States Army Corps of Engineers. The removal of that vegetation revealed the sodium silicate deposits that were located in that ditch.

61. That discovery prompted the Port to commission an environmental investigation of the PQ Corporation Facility, which was conducted between August 11–12, 2009. That investigation revealed the presence of sodium silicate deposits on the properties. The Port's investigation also revealed the existence of hazardous substances such as metals, carcinogenic polycyclic aromatic hydrocarbons ("cPAHs"), and hydrocarbons in concentrations that exceeded

COMPLAINT -- 11

Case No.

NORTHWEST RESOURCE LAW PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564

1  MTCA cleanup levels. Consistent with MTCA requirements, the Port reported these findings to
2  Ecology.

3        62.     On or about April 19, 2011, in response to the Port's report, Ecology sent the Port
4  an early notice letter "Regarding the Release of Hazardous Substances at the Former PQ
5  Corporation (site name) at 1202 Taylor Way." In that letter, Ecology advised that 1202 Taylor
6  Way had been added to Ecology's "database of Confirmed or Suspected Contaminated Sites" as
7  a "State Cleanup Site." Ecology further stated:

> This site has been added to our database because soil and groundwater contaminated at concentrations above the Model Toxics Control Act (MTCA) Method A cleanup criteria for industrial properties has been confirmed on this property. Soil is contaminated with petroleum Hydrocarbons, Cadmium and Mercury. Petroleum and various metals were detected in the groundwater samples.

      63.     On December 19, 2012, in response to Ecology adding the PQ Corporation Facility to the Confirmed or Suspected Contaminated Site List, the Port enrolled the PQ Corporation Facility into Ecology's "Voluntary Cleanup Program" as part of its ongoing efforts to remediate the properties to MTCA cleanup standards. Under this program, a party pays Ecology a fee to oversee the party's otherwise independent cleanup under MTCA, ensuring that the cleanup is conducted in accordance with MTCA and Ecology's regulations.

      64.     Since then, the Port has worked cooperatively with Ecology to remove and remediate the contamination at the PQ Corporation Facility at significant cost and expense to the Port.

      65.     On or about March 17, 2016, the Port and PQ LLC's predecessor entered into an interim cost sharing agreement (the "ICSA") to share financial responsibility for the Port's investigation and response actions and for "future shared costs." At that time, the Port was hopeful that PQ LLC's predecessor would take responsibility for the contamination it had left behind.

      66.     Unfortunately, in 2025, a dispute arose between the Port and PQ LLC, prompting PQ LLC to refuse to reimburse the Port for costs it had incurred over a several month period.

COMPLAINT -- 12

Case No.

NORTHWEST RESOURCE LAW PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564

PQ LLC's refusal to reimburse the Port led to the Port terminating the ICSA on April 15, 2025, and proceeding on its own with continued remediation of the PQ Corporation Facility.

67. During that same time, Ecology reassessed the status of the PQ Corporation facility, ranking it a "High" risk to the environment. Specifically, in March 2025, Ecology issued a site hazard assessment and ranking process ("SHARP") report for the PQ Corporation Facility. SHARP reports rate contaminated sites according to the risk level posed to humans and the broader environment. The SHARP report for the PQ Corporation Facility rated the site as "High" risk.

68. Ecology's SHARP reports also grade site contamination according to the level of exposure and severity posed by the contamination. Exposure is graded on a scale of A to D, with an "A" indicating that "there is a known exposure happening right now" and a "D" indicating that "there's no likely way for people or other living things to be exposed to this contamination." Severity is graded on a scale of 1 to 4, with "1" being the most severe and "4" being the least severe. Ecology graded the soil contamination the PQ Corporation Facility as "A1" and sediment contamination as "A3," assigning soils at the PQ Corporation Facility the most severe grade possible because of the contamination left behind by PQ LLC's predecessors.

69. Ecology was unambiguous in the SHARP report about the source of the hazardous substances that caused it to assign this severe grade:

> Releases from the PQ facility casued [sic] elevated pH in soil and groundwater and resulted in confirmed soil. [sic] sediment, and groundwater contamination and air contamination. Confirmed contaminants in soil, sediment, and/or groundwater include arsenic, lead, mercury, copper, nickel, zinc, petroleum hydrocarbons, and polycyclic aromatic hydrocarbons.

70. Because PQ LLC's predecessors conducted the only industrial activities at the PQ Corporation Facility in the past eighty-five years in the form of sodium silicate manufacturing, there should be no dispute that it was PQ LLC's predecessors who caused the releases of hazardous substances identified by Ecology in the SHARP report.

COMPLAINT -- 13

Case No.

NORTHWEST RESOURCE LAW PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564

71. While Ecology was reassessing the severity of this contamination, the Port was developing an action plan to address it. The Port prepared an "Interim Remedial Action Work Plan," and submitted that plan on July 23, 2025 to Ecology staff for review and approval. After receiving approval for that work plan from Ecology, the Port implemented the interim remedial action at the PQ Corporation Facility during the summer and early fall of 2025. That interim action removed the contamination caused by PQ LLC's predecessors that was located throughout the PQ Corporation Facility. The Port spent $7,300,000 to implement this interim action.

72. To date, including investigation and the interim action, the Port has incurred more than $8,000,000 in costs to investigate and remediate the PQ Corporation Facility.

73. The Port will need to conduct future monitoring and other remedial actions at the PQ Corporation Facility before Ecology provides its concurrence that the Port has met the requirements of MTCA and provides the Port with a "No Further Action" letter.

74. The Port anticipates that these additional remedial actions at the PQ Corporation Facility will be significant, given the extent and scope of contamination, and will likely cost several more millions of dollars.

75. As demonstrated by the nature of the work performed by the Port and Ecology's oversight of that work, all remedial action costs incurred by the Port are the substantial equivalent of an Ecology-supervised cleanup. All future costs—to be conducted with oversight by Ecology through the Voluntary Cleanup Program—will be incurred as the substantial equivalent of an Ecology-supervised cleanup as well.

76. The Port has made repeated demands to PQ LLC and its predecessors over the years to reimburse the Port for its investigative and remedial costs for which PQ LLC is responsible and to accept responsibility for future remediation costs, but PQ LLC and its predecessors have repeatedly refused to accept their responsibility.

COMPLAINT -- 14

Case No.

NORTHWEST RESOURCE LAW PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564

## VI. FIRST CAUSE OF ACTION: RECOVERY OF REMEDIAL ACTION COSTS UNDER WASH. REV. CODE 70.305A.040

77. The Port realleges paragraphs 1 through 76.

78. The PQ Corporation Facility is a "facility" as defined in Wash. Rev. Code §70A.305.020(8).

79. From 1940 to 2008, PQ LLC's predecessors in interest were the Philadelphia Quartz Company of California, Ltd., a California corporation, and later, PQ Corporation, a Philadelphia corporation. Accordingly, the Philadelphia Quartz Company of California, Ltd. and PQ Corporation are "person[s]" as defined in Wash. Rev. Code §70A.305.020(24).

80. The Philadelphia Quartz Company of California, Ltd. and later, PQ Corporation, legally and beneficially owned 1114 and 1202 Taylor Way between 1941 and 2008 and operated a sodium silicate facility on those properties during that period. Accordingly, as the successor in interest to those corporations, PQ LLC was the "owner or operator" of the PQ Corporation Facility as that term is defined in Wash. Rev. Code §70A.305.020(22) from 1941 to 2008.

81. "Hazardous substance[s]," as that term is defined by Wash. Rev. Code §70A.305.020(13), were released or disposed of during the ownership and/or operation of the PQ Corporation Facility by PQ LLC's predecessors.

82. Under Wash. Rev. Code §70A.305.040, the person who owned or operated a facility at the time of disposal or release of hazardous substances is liable for the remedial action costs resulting from the releases or threatened releases of hazardous substances. Accordingly, PQ LLC is liable for the cost to remediate the hazardous substances at the PQ Corporation Facility that its predecessors in interest disposed of or released during the period those entities owned and operated the PQ Corporation Facility.

83. Under Wash. Rev. Code §70A.305.080, a person may bring a private right of action against any other person liable under Wash. Rev. Code §70A.305.040 for the recovery of remedial action costs.

COMPLAINT -- 15

Case No.

NORTHWEST RESOURCE LAW PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564

84. As a port district, the Port is a person as defined in Wash. Rev. Code §70A.305.020(24).

85. The Port has incurred remedial action costs to address PQ LLC's predecessors' releases of hazardous substances at the PQ Corporation Facility that are the substantial equivalent of an Ecology-supervised cleanup.

86. Accordingly, because PQ LLC is a liable person under Wash. Rev. Code §70A.305.040, the Port is entitled under Wash. Rev. Code §70A.305.080 to recover all remedial action costs already incurred or that may be incurred to remediate the contamination caused by PQ LLC's predecessors' disposal or release of hazardous substances at the PQ Corporation Facility.

87. The Port is also entitled under Wash. Rev. Code §70A.305.080 to recover its reasonable attorneys' fees and costs in pursuing this action.

### VII. SECOND CAUSE OF ACTION: DECLARATORY JUDGMENT UNDER WASH. REV. CODE §70A.305.080 AND 28 U.S.C. §2201

88. The Port realleges paragraphs 1 through 87.

89. Under Wash. Rev. Code §70A.305.080, a person may bring a private right of action against any other person liable under Wash. Rev. Code §70A.305.040 for declaratory relief for the recovery of future remedial action costs.

90. Accordingly, the Port is entitled to bring this private action for declaratory relief against PQ LLC for all future remedial action costs incurred by the Port to remediate the contamination caused by PQ LLC's predecessors' disposal or release of hazardous substances at the PQ Corporation Facility.

91. 28 U.S.C. §2201 authorizes this Court, in an actual controversy within its jurisdiction, to declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

COMPLAINT -- 16

Case No.

NORTHWEST RESOURCE LAW PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564

92.　Since the Port and PQ LLC disagree about their respective liabilities for the remediation of hazardous substances at the PQ Corporation Facility, an "actual controversy" within this Court's jurisdiction exists. Furthermore, a declaration is an appropriate remedy under the circumstances because the Port continues to conduct remedial activities at the PQ Corporation Facility.

93.　Accordingly, the Port is entitled under Wash. Rev. Code §70A.305.080 and 28 U.S.C. §2201 to a declaration that PQ LLC is liable for all future remedial action costs incurred by the Port to remediate the contamination caused by PQ LLC's predecessors' disposal or release of hazardous substances at the PQ Corporation Facility.

## VIII.　PRAYER FOR RELIEF

The Port respectfully prays for the following relief:

1.　For payment by PQ LLC of all past remedial action costs that the Port has incurred in response to the contamination caused by PQ LLC's predecessors' disposal or release of hazardous substances at the PQ Corporation Facility;

2.　Declaring PQ LLC liable for all future remedial action costs to be incurred by the Port in response to the contamination caused by PQ LLC's predecessors' disposal or release of hazardous substances at the PQ Corporation Facility;

3.　For an award of attorneys' fees and expenses pursuant to Wash. Rev. Code §70A.305.080; and

4.　For an award of any other relief, equitable or otherwise, that the Court deems appropriate.

COMPLAINT -- 17

Case No.

NORTHWEST RESOURCE LAW PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564

DATED this 20th day of February, 2026.

NORTHWEST RESOURCE LAW PLLC

*s/ Douglas J. Steding*
*s/ Merryn B. DeBenedetti*
*s/ Eman Jeddy*
Douglas J. Steding, WSBA #37020
dsteding@nwresourcelaw.com
206.971.1567
Merryn B. DeBenedetti, WSBA #35777
mdebenedetti@nwresourcelaw.com
206.971.1569
Eman Jeddy, WSBA #64454
ejeddy@nwresourcelaw.com
206.971.1566

*Attorneys for Plaintiff Port of Tacoma*

COMPLAINT -- 18

Case No.

**NORTHWEST RESOURCE LAW PLLC**
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564